570 A.2d 528

**URBAN REDEVELOPMENT AUTHORITY OF PITTSBURGH, a Redevelopment Authority, Appellee,**

v.

**KML SALES, INC., a Corporation, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 19, 1989.

Filed Feb. 1, 1990.

Reargument Denied March 13, 1990.

W. Arch Irvin, Jr., Pittsburgh, for appellant.

Robert M. Brown, Pittsburgh, for appellee.

Before McEWEN, POPOVICH and MONTGOMERY, JJ.

POPOVICH, Judge:

This is an appeal from the judgment entered on January 18, 1989, by the Court of Common Pleas of Allegheny County, following a directed verdict in favor of appellee, the Urban Redevelopment Authority of Pittsburgh. We affirm.

The facts set forth in the trial court's opinion are:

The case involves an unusual factual situation pertaining to real estate. The Consolidated Rail Corporation, known as Con Rail, inherited from the bankruptcy of the Pennsylvania Railroad, various properties including a large building in the Strip District of the city of Pittsburgh known as the Produce Terminal Building, tenants of which are in the produce business except the defendant KML which is a major tenant occupying the 44,500 square feet of space.

Lately Con Rail has been prospering, but in 1979 and prior thereto it was losing so much money that it could not afford to repair anything which was not directly involved in rail movements. Meanwhile, the tenants of the Produce Terminal Building were complaining loudly about the leaking roof. An apparent solution of this problem was reached by an arrangement whereby KML would replace the roof at a cost of $350,000.00 and in return receive a rent abatement of $350,000.00, plus interest, at the rate of 13% per annum.

Consequently, the Consolidated Rail Corporation and the defendant, KML, executed a lease agreement dated September 11, 1979, for the space occupied by KML for a term of five years and an option to the lessee to renew for an additional five years. The special provisions of this lease agreement which gave rise to this case are as follows:

"ROOF WORK   Lessee will, in a manner satisfactory to Lessor, remove the existing roof covering the Produce Terminal Building, but not including canopies over the loading docks, and replace same with a new roof consisting of asphalt and tar composition at a total cost of

Three Hundred Fifty Thousand and No/100 ($350,-000.00) Dollars."

and

"RENT ABATEMENT In exchange for the roofing aforesaid by the Lessee to the reasonable satisfaction of Lessor, Lessor hereby agrees to waive rental payable under the terms hereof from the effective date until such time as Lessee has recovered the $350,-000.00, plus interest, imputed on the outstanding and unamortized balance of the investment at the rate of 13% per annum."

It would be difficult to compose language which would more emphatically provide for two things; namely, the removal of the existing roof and its replacement by another which would be new.

John W. Hindman was an Assistant Manager of Real Estate for Con Rail and he testified for the defense that he had charge of the Produce Terminal and said that he was the originator of the deal with KML in respect to a new roof and rent abatement despite that the lease agreement was signed by an executive vice-president of Con Rail, although in response to leading questions by defense counsel the record reads as though Mr. Hindman had signed it personally, but this of course is a matter of no consequence except that he indicated awareness that the agreement provided for a new roof rather than repair of the existing roof.

Shortly after the execution of the Agreement, KML instituted work on the roof and Mr. Hindman visited the scene at times and observed that the procedure being followed was merely the replacement of surface material of the roof, rather than the removal and replacement of the roof. This presented an opportunity to Mr. Hindman to solve another bothersome problem which had been worrying him and he decided to make a new deal with KML on his own. This was made possible when a supervisor of construction named George Hawkins inspected the roof after the repairs were made and being unaware

that the roof was supposed to be completely replaced, said that the repairs were acceptable from his viewpoint. Mr. Hindman explains the new oral arrangement as follows:

Q. Did you then upon the roof make an agreement with Mr. Keicher?

A. You mean a written agreement, verbal agreement.

Q. Verbal agreement.

A. Verbally we had some further discussions.

Q. Can you tell the jury what the verbal agreement discussion was?

\* \* \* \* \* \*

Q. Answer the question. Tell the jury what the agreement that you and Mr. Keicher made there as to—

A. Well, one of the things I did at that time, for some time, as I said, they had been a prior tenant of ours, and they had been saying that we owed them approximately $70,000 for other work they had performed, and I finally said to him we would accept the roof if they would forget the other $70,000, and if they do that, I will put in—I will concur that the roof is fine, which was what we had to have so we could get on with the rent abatement program.

Q. Did Mr. Keicher agree with you that you had a deal?

A. Yes.

Q. Did you shake on it?

A. Yes, because I said I didn't want to hear any more about that $70,000."

Then for his protection before starting the rent abatement, Mr. Hindman had Mr. Hawkins write him a letter saying that the roofing work was satisfactory, again of course without reference to the written agreement to remove and replace the roof which was not even known to Mr. Hawkins. Also there is nothing in the record to suggest that the Vice–President who signed the Lease

Agreement or any official of the railroad of higher rank than Mr. Hindman were made aware of the private oral agreement which he entered into with Mr. Keicher in behalf of KML.

On October 3, 1980, which would be about ten months after KML ceased to pay rent to Con Rail, Con Rail agreed in writing to sell the Produce Terminal Building to the plaintiff, the Urban Redevelopment Authority of the City of Pittsburgh. The conveyance took place on February 23, 1981. The tenants were made aware of the sale specifically when URA called them to a meeting, mainly to dispel any anxiety they might have such as concern for continued occupancy.

Prior to its purchase of the Produce Terminal Building, URA was made aware of the written Lease Agreement of September 11, 1979, and was given an original or a copy of it and knew that because of its provisions KML was not paying rent and would not be paying rent for a long time into the future. This was of course unavoidable since the provisions of the Agreement, in combination with the granting of rent abatement by Con Rail, made it appear to be clear that a brand new roof had been placed on the building in accordance with the contractual obligation of KML.

Then not very long after the acquisition of the building by URA, leaking of the roof again became so prevalent that an expert examination of the roof was undertaken in January of 1982. With this type of roof, one cannot tell whether it has been replaced by ordinary examination. It was necessary to cut into the roof and remove samples for testing and when this was done, it was clearly revealed not only that KML had not removed the old roof and replaced it, but that the repair work which was done was so inadequate that it practically guaranteed that the roof would again fail. Consequently, URA was compelled to replace the roof and it then sued for its losses. The only loss held to be compensable at the hands of

KML was unpaid rent and as was said, a verdict for this loss was directed for the plaintiff.

Trial Court Opinion, pp. 1–5.

■ At trial, the lower court directed verdict in favor of URA on the ground that KML could not enforce the "new" lease against URA, when URA purchased the property without knowledge of it. However, upon post-verdict motions, the lower court held that KML's defense of accord and satisfaction was waived by its failure to plead it as an affirmative defense. Thereafter, appellant filed the present appeal questioning:

I.   Whether a defense may be precluded by the opinion of the lower court on the basis that it had not been pleaded when the lower court's rulings prior to the issuance of the opinion indicated that the defendant's pleadings were broad enough to encompass such a defense and evidence of the defense was admitted? [1]

II.   Whether an assignee of a lessor's rights in a lease of real property may recover from a tenant under a lease agreement that has been modified prior to the assignment, when the assignor of the lessor's interest could not have recovered under that very agreement because the modification, in the nature of an accord and satisfaction, novation, or acceptance, precludes recovery by the assignor?

III.   Whether a lessee of real property has a duty to inform prospective purchasers of the property of the nature of the tenancy when there is no evidence to show that the tenant was aware of the existence of the prospective purchaser? [2]

---

1.  A thorough review of the record failed to reveal any such ruling by the trial judge. However, it is clear that URA objected to KML's raising of the defense and the court sustained the objection twice before allowing KML to question Mr. Hindman about the new oral lease. T.T., pp. 401, 415–417.

2.  KML has waived the affirmative defense of accord and satisfaction (see discussion *infra*). Therefore, this argument must fail. Herein, URA complied with its duty to inquire on what terms KML was in possession of the property. *Atlantic Refining Co. v. Wyoming Nat. Bank,* 356 Pa. 226, 229, 51 A.2d 719, 724 (1947). URA had full

IV. Whether it is incumbent upon a tenant to seek indemnity from the assignor of a lessor's interest in a lease when the assignee itself brought an action to recover against the assignor and the assignee chose to generally release the assignor? [3]

V. Whether a vendee of real property has a cause of action against a tenant for an alleged breach of lease terms regarding improvements by the tenant when the property was purchased pursuant to a purchase agreement clearly stating that the property was being purchased in an "as is" condition, without reliance upon any representations made by the vendor? [4]

The crux of KML's appeal—its "whole case" [5]—is that the lower court erred in directing the verdict in URA's favor when the defense of "accord and satisfaction" precludes recovery. KML argues that a new oral deal modifying their written lease was struck between itself and Con Rail whereby KML would merely resurface the roof (rather

knowledge of the written lease which provided, *inter alia, any modification had to be in writing.* Despite KML's contention otherwise, evidence revealed that the Produce Terminal tenants were informed in advance of URA's plans to purchase the terminal. T.T., p. 19. Accordingly, even if the defense of accord and satisfaction was not waived, KML may be estopped from asserting the oral modification of the written lease. *Atlantic Refining,* 51 A.2d at 724.

3. Certainly, KML is under no duty to seek indemnity from Con Rail, and the trial court made no such ruling. Our concern herein is the rights and obligations between URA and KML based upon the written (Con Rail/KML) lease. KML must remember that its failure to raise properly and prove the affirmative defense of accord and satisfaction has placed the company in its present practical position of having to file suit against Con Rail.

4. Though KML is certainly an intended third party beneficiary of the contract for the sale of the produce terminal with regard to enforcement of the provisions of the written lease, equally certain is the fact the KML is not an intended beneficiary of the contract with regard to the "as is" purchase provision. Therefore, KML has no authority to enforce the "as is" provision of the contract. See generally, *Manor Junior College v. Kaller's Inc.,* 352 Pa.Super. 310, 507 A.2d 1245 (1986); *Meyers Plumbing and Heating Supply Co. v. West End Federal Sav. and Loan Ass'n,* 345 Pa.Super. 559, 498 A.2d 966 (1985).

5. Attorney for appellant stated on the record that accord and satisfaction was appellant's "whole case." Trial Transcript, p. 417.

than remove and replace it) and forgive a $70,000 debt owed to it by Con Rail in exchange for the rent abatement.

Regardless of the merits of appellant's argument, appellant must first cross a threshold through which all defendants who wish to raise an affirmative defense must pass. Pursuant to Rule 1030 of the Pennsylvania Rules of Civil Procedure, "[a]ll affirmative defenses including but not limited to accord and satisfaction ... shall be pleaded in a responsive pleading under the heading 'New Matter'." Pursuant to Rule 1032, "[a] party waives all defenses and objections which he does not present either by preliminary objection, answer or reply ...". Instantly, appellant failed to plead the affirmative defense of accord and satisfaction.

A review of appellant's answer and amended new matter filed on October 23, 1985,[6] reveals that appellant averred complete compliance with the *written* lease agreement to remove and replace the roof; nowhere within that pleading can even a hint of accord and satisfaction be found. Not until KML's second pre trial statement was filed on August 12, 1986 (over three and one-half years after the original complaint was filed on December 23, 1982), was the defense of accord and satisfaction even slightly hinted, and then only the most gifted counsel would have recognized or anticipated it.[7] Only after trial began was KML's intention to raise the affirmative defense of accord and satisfaction fully revealed. Moreover, KML never requested leave to amend its answer to include the defense, even though KML knew that its answer may not have been broad enough to encompass accord and satisfaction.

6. KML's original answer and new matter was filed on January 19, 1983.

7. Specifically, the pre-trial statement, in part, read: "As a matter of law, an ambiguous contract term will be given the meaning the contracting parties intend it to have. Thus, Con Rail and KML were in complete agreement that the existing roof was not to be removed but merely repaired, and the URA is barred from asserting the lease agreement called for the roof to be removed." Pre-trial Statement, filed August 12, 1986, paragraph 11.

Accordingly, we affirm the lower court's ruling that KML was precluded from raising the defense of accord and satisfaction due to its failure to plead the affirmative defense.

Order affirmed.